(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HARRINGTON, WARDEN *v.* RICHTER

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–587.   Argued October 12, 2010—Decided January 19, 2011

In 1994, deputies called to drug dealer Johnson's California home found
Johnson wounded and Klein fatally wounded.  Johnson claimed that
he was shot in his bedroom by respondent Richter's codefendant,
Branscombe; that he found Klein on the living room couch; and that
his gun safe, a pistol, and cash were missing.  His account was cor-
roborated by evidence at the scene, including, relevant here, spent
shell casings, blood spatters, and blood pooled in the bedroom door-
way.  Investigators took a blood sample from a wall near the bedroom
door, but not from the blood pool.  A search of Richter's home turned
up the safe and ammunition matching evidence at the scene.  After
his arrest on murder and other charges, Richter initially denied his
involvement, but later admitted disposing of Johnson's and
Branscombe's guns.  The prosecution initially built its case on John-
son's testimony and the circumstantial evidence, but it adjusted its
approach after Richter's counsel, in his opening statement, outlined
the theory that Branscombe shot Johnson in self-defense and that
Klein was killed in the crossfire in the bedroom doorway, and
stressed the lack of forensic support for the prosecution's case.  The
prosecution then decided to call an expert in blood pattern evidence,
who testified that it was unlikely that Klein had been shot outside
the living room and then moved to the couch, and a serologist, who
testified that the blood sample taken near the blood pool could be
Johnson's but not Klein's.  Under cross-examination, she conceded
that she had not tested the sample for cross-contamination and that
a degraded sample would make it difficult to tell if it had blood of
Klein's type.  Defense counsel called Richter to tell his conflicting
version of events and called other witnesses to corroborate Richter's
version.  Richter was convicted and sentenced to life without parole.

He later sought habeas relief from the California Supreme Court, asserting, *inter alia,* that his counsel provided ineffective assistance, see *Strickland* v. *Washington*, 466 U. S. 668, when he failed to present expert testimony on blood evidence, because it could have disclosed the blood pool's source and bolstered Richter's theory. He also offered affidavits from forensics experts to support his claim. The court denied the petition in a one-sentence summary order. Subsequently, he reasserted his state claims in a federal habeas petition. The District Court denied his petition. A Ninth Circuit panel affirmed, but the en banc court reversed. Initially it questioned whether 28 U. S. C. §2254(d)—which, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), limits the availability of federal habeas relief for claims previously "adjudicated on the merits" in state court—applied to Richter's petition, since the State Supreme Court issued only a summary denial. But it found the state-court decision unreasonable anyway. In its view, trial counsel was deficient in failing to consult blood evidence experts in planning a trial strategy and in preparing to rebut expert evidence the prosecution might—and later did—offer.

*Held*:

1. Section 2254(d) applies to Richter's petition, even though the state court's order was unaccompanied by an opinion explaining the court's reasoning. Pp. 7–10.

   (a) By its terms, §2254(d) bars relitigation of a claim "adjudicated on the merits" in state court unless, among other exceptions, the earlier state-court "decision" involved "an unreasonable application" of "clearly established Federal law, as determined by" this Court, §2254(d)(1). Nothing in its text—which refers only to a "decision" resulting "from an adjudication"—requires a statement of reasons. Where the state-court decision has no explanation, the habeas petitioner must still show there was no reasonable basis for the state court to deny relief. There is no merit to the assertion that applying §2254(d) when state courts issue summary rulings will encourage those courts to withhold explanations. The issuance of summary dispositions can enable state judiciaries to concentrate resources where most needed. Pp. 7–9.

   (b) Nor is there merit to Richter's argument that §2254(d) does not apply because the California Supreme Court did not say it was adjudicating his claim "on the merits." When a state court has denied relief, adjudication on the merits can be presumed absent any contrary indication or state-law procedural principles. The presumption may be overcome by a more likely explanation for the state court's decision, but Richter does not make that showing here. Pp. 9–10.

2. Richter was not entitled to the habeas relief ordered by the Ninth Circuit. Pp. 10–24.

(a) That court failed to accord the required deference to the decision of a state court adjudicating the same claims later presented in the federal habeas petition. Its opinion shows an improper understanding of §2254(d)'s unreasonableness standard and operation in the context of a *Strickland* claim. Asking whether the state court's application of *Strickland*'s standard was unreasonable is different from asking whether defense counsel's performance fell below that standard. Under AEDPA, a state court must be granted a deference and latitude that are not in operation in a case involving direct review under *Strickland*. A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fair-minded jurists could disagree" on the correctness of that decision. *Yarborough* v. *Alvarado*, 541 U. S. 652, 664. And the more general the rule being considered, "the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* The Ninth Circuit explicitly conducted a *de novo* review and found a *Strickland* violation; it then declared without further explanation that the state court's contrary decision was unreasonable. But §2254(d) requires a habeas court to determine what arguments or theories supported, or could have supported, the state-court decision; and then to ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with a prior decision of this Court. AEDPA's unreasonableness standard is not a test of the confidence of a federal habeas court in the conclusion it would reach as a *de novo* matter. Even a strong case for relief does not make the state court's contrary conclusion unreasonable. Section 2254(d) is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions. Pp. 10–14.

(b) The Ninth Circuit erred in concluding that Richter demonstrated an unreasonable application of *Strickland* by the state court. Pp. 14–23.

(1) Richter could have secured relief in state court only by showing both that his counsel provided deficient assistance and that prejudice resulted. To be deficient, counsel's representation must have fallen "below an objective standard of reasonableness," *Strickland*, 466 U. S., at 688; and there is a "strong presumption" that counsel's representation is within the "wide range" of reasonable professional assistance, *id.,* at 689. The question is whether counsel made errors so fundamental that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. Prejudice requires demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been differ-

ent." *Id.,* at 694. "Surmounting *Strickland*'s high bar is never . . . easy." *Padilla* v. *Kentucky*, 559 U. S.___, ___. *Strickland* can function as a way to escape rules of waiver and forfeiture. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is even more difficult, since both standards are "highly deferential," 466 U. S, at 689, and since *Strickland*'s general standard has a substantial range of reasonable applications. The question under §2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. Pp. 14–16.

(2) The Ninth Circuit erred in holding that because Richter's attorney had not consulted forensic blood experts or introduced expert evidence, the State Supreme Court could not reasonably have concluded counsel provided adequate representation.

A state court could reasonably conclude that a competent attorney could elect a strategy that did not require using blood evidence experts. Rare are the situations in which the latitude counsel enjoys will be limited to any one technique or approach. There were any number of experts whose insight might have been useful to the defense. Counsel is entitled to balance limited resources in accord with effective trial tactics and strategies. In finding otherwise the Ninth Circuit failed to "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Strickland, supra,* at 689. Given the many factual differences between the prosecution and defense versions of events, it was far from evident at the time of trial that the blood source was central to Richter's case. And relying on "the harsh light of hindsight" to cast doubt on a trial that took place over 15 years ago is precisely what *Strickland* and AEDPA seek to prevent. See *Bell* v. *Cone*, 535 U. S. 685, 702. Even had the value of expert testimony been apparent, it would be reasonable to conclude that a competent attorney might elect not to use it here, where counsel had reason to question the truth of his client's account. Making blood evidence a central issue could also have led the prosecution to produce its own expert analysis, possibly destroying Richter's case, or distracted the jury with esoteric questions of forensic science. Defense counsel's opening statement may have inspired the prosecution to present forensic evidence, but that shows only that the defense strategy did not work out as well as hoped. In light of the record here there was no basis to rule that the state court's determination was unreasonable.

The Court of Appeals erred in dismissing such concern as an inac-

curate account of counsel's actual thinking, since *Strickland* exam-
ined only the objective reasonableness of counsel's actions. As to
whether counsel was constitutionally deficient for not preparing ex-
pert testimony as a response to the prosecution's, an attorney may
not be faulted for a reasonable miscalculation or lack of foresight or
for failing to prepare for remote possibilities. Here, even if counsel
was mistaken, the prosecution itself did not expect to present forensic
testimony until the eve of trial. Thus, it is at least debatable whether
counsel's error was so fundamental as to call the trial's fairness into
doubt. Even if counsel should have foreseen the prosecution's tactic,
Richter would still need to show it was indisputable that *Strickland*
required his attorney to rely on a rebuttal witness rather than on
cross-examination to discredit the witnesses, but *Strickland* imposes
no such requirement. And while it is possible an isolated error can
constitute ineffective assistance if it is sufficiently egregious, it is dif-
ficult to establish ineffective assistance where counsel's overall per-
formance reflects active and capable advocacy. Pp. 16–22.

 (3) The Ninth Circuit also erred in concluding that Richter had
established prejudice under *Strickland*, which asks whether it is
"reasonably likely" the verdict would have been different, 466 U. S.,
at 696, not whether a court can be certain counsel's performance had
no effect on the outcome or that reasonable doubt might have been
established had counsel acted differently. There must be a substan-
tial likelihood of a different result. The State Supreme Court could
have reasonably concluded that Richter's prejudice evidence fell short
of this standard. His expert serology evidence established only a
theoretical possibility of Klein's blood being in the blood pool; and at
trial, defense counsel extracted a similar concession from the prose-
cution's expert. It was also reasonable to find Richter had not estab-
lished prejudice given that he offered no evidence challenging other
conclusions of the prosecution's experts, *e.g.,* that the blood sample
matched Johnson's blood type. There was, furthermore, sufficient
conventional circumstantial evidence pointing to Richter's guilt, in-
cluding, *e.g.,* the items found at his home. Pp. 22–23.

578 F. 3d 944, reversed and remanded.

 KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and SCALIA, THOMAS, BREYER, ALITO, and SOTOMAYOR, JJ., joined.
GINSBURG, J., filed an opinion concurring in the judgment. KAGAN, J.,
took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–587

## KELLY HARRINGTON, WARDEN, PETITIONER *v.* JOSHUA RICHTER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 19, 2011]

JUSTICE KENNEDY delivered the opinion of the Court.

The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law. Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources. Those resources are diminished and misspent, however, and confidence in the writ and the law it vindicates undermined, if there is judicial disregard for the sound and established principles that inform its proper issuance. That judicial disregard is inherent in the opinion of the Court of Appeals for the Ninth Circuit here under review. The Court of Appeals, in disagreement with the contrary conclusions of the Supreme Court of the State of California and of a United States District Court, ordered habeas corpus relief granted to set aside the conviction of Joshua Richter, respondent here. This was clear error.

Under 28 U. S. C. §2254(d), the availability of federal habeas relief is limited with respect to claims previously "adjudicated on the merits" in state-court proceedings. The first inquiry this case presents is whether that pro-

vision applies when state-court relief is denied without an accompanying statement of reasons. If it does, the question is whether the Court of Appeals adhered to the statute's terms, in this case as it relates to ineffective-assistance claims judged by the standard set forth in *Strickland* v. *Washington*, 466 U. S. 668 (1984). A second case decided today, *Premo* v. *Moore*, *post*, p. ___, presents similar issues. Here, as in that case, it is necessary to reverse the Court of Appeals for failing to accord required deference to the decision of a state court.

I

It is necessary to begin by discussing the details of a crime committed more than a decade and a half ago.

A

Sometime after midnight on December 20, 1994, sheriff's deputies in Sacramento County, California, arrived at the home of a drug dealer named Joshua Johnson. Hours before, Johnson had been smoking marijuana in the company of Richter and two other men, Christian Branscombe and Patrick Klein. When the deputies arrived, however, they found only Johnson and Klein. Johnson was hysterical and covered in blood. Klein was lying on a couch in Johnson's living room, unconscious and bleeding. Klein and Johnson each had been shot twice. Johnson recovered; Klein died of his wounds.

Johnson gave investigators this account: After falling asleep, he awoke to find Richter and Branscombe in his bedroom, at which point Branscombe shot him. Johnson heard more gunfire in the living room and the sound of his assailants leaving. He got up, found Klein bleeding on the living room couch, and called 911. A gun safe, a pistol, and $6,000 cash, all of which had been in the bedroom, were missing.

Evidence at the scene corroborated Johnson's account. Investigators found spent shell casings in the bedroom (where Johnson said he had been shot) and in the living room (where Johnson indicated Klein had been shot). In the living room there were two casings, a .32 caliber and a .22 caliber. One of the bullets recovered from Klein's body was a .32 and the other was a .22. In the bedroom there were two more casings, both .32 caliber. In addition detectives found blood spatter near the living room couch and bloodstains in the bedroom. Pools of blood had collected in the kitchen and the doorway to Johnson's bedroom. Investigators took only a few blood samples from the crime scene. One was from a blood splash on the wall near the bedroom doorway, but no sample was taken from the doorway blood pool itself.

Investigators searched Richter's residence and found Johnson's gun safe, two boxes of .22-caliber ammunition, and a gun magazine loaded with cartridges of the same brand and type as the boxes. A ballistics expert later concluded the .22-caliber bullet that struck Klein and the .22-caliber shell found in the living room matched the ammunition found in Richter's home and bore markings consistent with the model of gun for which the magazine was designed.

Richter and Branscombe were arrested. At first Richter denied involvement. He would later admit taking Johnson's pistol and disposing of it and of the .32-caliber weapon Branscombe used to shoot Johnson and Klein. Richter's counsel produced Johnson's missing pistol, but neither of the guns used to shoot Johnson and Klein was found.

### B

Branscombe and Richter were tried together on charges of murder, attempted murder, burglary, and robbery. Only Richter's case is presented here.

The prosecution built its case on Johnson's testimony and on circumstantial evidence. Its opening statement took note of the shell casings found at the crime scene and the ammunition and gun safe found at Richter's residence. Defense counsel offered explanations for the circumstantial evidence and derided Johnson as a drug dealer, a paranoid, and a trigger-happy gun fanatic who had drawn a pistol on Branscombe and Richter the last time he had seen them. And there were inconsistencies in Johnson's story. In his 911 call, for instance, Johnson first said there were four or five men who had broken into his house, not two; and in the call he did not identify Richter and Branscombe among the intruders.

Blood evidence does not appear to have been part of the prosecution's planned case prior to trial, and investigators had not analyzed the few blood samples taken from the crime scene. But the opening statement from the defense led the prosecution to alter its approach. Richter's attorney outlined the theory that Branscombe had fired on Johnson in self-defense and that Klein had been killed not on the living room couch but in the crossfire in the bedroom doorway. Defense counsel stressed deficiencies in the investigation, including the absence of forensic support for the prosecution's version of events.

The prosecution took steps to adjust to the counterattack now disclosed. Without advance notice and over the objection of Richter's attorney, one of the detectives who investigated the shootings testified for the prosecution as an expert in blood pattern evidence. He concluded it was unlikely Klein had been shot outside the living room and then moved to the couch, given the patterns of blood on Klein's face, as well as other evidence including "high velocity" blood spatter near the couch consistent with the location of a shooting. The prosecution also offered testimony from a serologist. She testified the blood sample taken near the pool by the bedroom door could be John-

son's but not Klein's.

Defense counsel's cross-examination probed weaknesses in the testimony of these two witnesses. The detective who testified on blood patterns acknowledged that his inferences were imprecise, that it was unlikely Klein had been lying down on the couch when shot, and that he could not say the blood in the living room was from either of Klein's wounds. Defense counsel elicited from the serologist a concession that she had not tested the bedroom blood sample for cross-contamination. She said that if the year-old sample had degraded, it would be difficult to tell whether blood of Klein's type was also present in the sample.

For the defense, Richter's attorney called seven witnesses. Prominent among these was Richter himself. Richter testified he and Branscombe returned to Johnson's house just before the shootings in order to deliver something to one of Johnson's roommates. By Richter's account, Branscombe entered the house alone while Richter waited in the driveway; but after hearing screams and gunshots, Richter followed inside. There he saw Klein lying not on the couch but in the bedroom doorway, with Johnson on the bed and Branscombe standing in the middle of the room. According to Richter, Branscombe said he shot at Johnson and Klein after they attacked him. Other defense witnesses provided some corroboration for Richter's story. His former girlfriend, for instance, said she saw the gun safe at Richter's house shortly before the shootings.

The jury returned a verdict of guilty on all charges. Richter was sentenced to life without parole. On appeal, his conviction was affirmed. *People* v. *Branscombe*, 72 Cal. Rptr. 2d 773 (Cal. App. 1998) (officially depublished). The California Supreme Court denied a petition for review, *People* v. *Branscombe*, No. S069751, 1998 Cal. LEXIS 4252 (June 24, 1998), and Richter did not file a

petition for certiorari with this Court. His conviction became final.

## C

Richter later petitioned the California Supreme Court for a writ of habeas corpus. He asserted a number of grounds for relief, including ineffective assistance of counsel. As relevant here, he claimed his counsel was deficient for failing to present expert testimony on serology, pathology, and blood spatter patterns, testimony that, he argued, would disclose the source of the blood pool in the bedroom doorway. This, he contended, would bolster his theory that Johnson had moved Klein to the couch.

He offered affidavits from three types of forensic experts. First, he provided statements from two blood serologists who said there was a possibility Klein's blood was intermixed with blood of Johnson's type in the sample taken from near the pool in the bedroom doorway. Second, he provided a statement from a pathologist who said the blood pool was too large to have come from Johnson given the nature of his wounds and his own account of his actions while waiting for the police. Third, he provided a statement from an expert in bloodstain analysis who said the absence of "a large number of satellite droplets" in photographs of the area around the blood in the bedroom doorway was inconsistent with the blood pool coming from Johnson as he stood in the doorway. App. 118. Richter argued this evidence established the possibility that the blood in the bedroom doorway came from Klein, not Johnson. If that were true, he argued, it would confirm his account, not Johnson's. The California Supreme Court denied Richter's petition in a one-sentence summary order. See *In re Richter*, No. S082167 (Mar. 28, 2001), App. to Pet. for Cert. 22a. Richter did not seek certiorari from this Court.

After the California Supreme Court issued its summary

order denying relief, Richter filed a petition for habeas corpus in United States District Court for the Eastern District of California. He reasserted the claims in his state petition. The District Court denied his petition, and a three-judge panel of the Court of Appeals for the Ninth Circuit affirmed. See *Richter* v. *Hickman*, 521 F. 3d 1222 (2008). The Court of Appeals granted rehearing en banc and reversed the District Court's decision. See *Richter* v. *Hickman*, 578 F. 3d 944 (2009).

As a preliminary matter, the Court of Appeals questioned whether 28 U. S. C. §2254(d) was applicable to Richter's petition, since the California Supreme Court issued only a summary denial when it rejected his *Strickland* claims; but it determined the California decision was unreasonable in any event and that Richter was entitled to relief. The court held Richter's trial counsel was deficient for failing to consult experts on blood evidence in determining and pursuing a trial strategy and in preparing to rebut expert evidence the prosecution might—and later did—offer. Four judges dissented from the en banc decision.

We granted certiorari. 559 U. S. ___ (2010).

## II

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U. S. C. §2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of §2254(d) states:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly estab-
lished Federal law, as determined by the Supreme
Court of the United States; or

  "(2) resulted in a decision that was based on an un-
reasonable determination of the facts in light of the
evidence presented in the State court proceeding."

As an initial matter, it is necessary to decide whether
§2254(d) applies when a state court's order is unaccompa-
nied by an opinion explaining the reasons relief has been
denied.

  By its terms §2254(d) bars relitigation of any claim
"adjudicated on the merits" in state court, subject only to
the exceptions in §§2254(d)(1) and (d)(2). There is no text
in the statute requiring a statement of reasons. The
statute refers only to a "decision," which resulted from an
"adjudication." As every Court of Appeals to consider the
issue has recognized, determining whether a state court's
decision resulted from an unreasonable legal or factual
conclusion does not require that there be an opinion from
the state court explaining the state court's reasoning. See
*Chadwick* v. *Janecka*, 312 F. 3d 597, 605–606 (CA3 2002);
*Wright* v. *Secretary for Dept. of Corrections*, 278 F. 3d
1245, 1253–1254 (CA11 2002); *Sellan* v. *Kuhlman*, 261
F. 3d 303, 311–312 (CA2 2001); *Bell* v. *Jarvis*, 236 F. 3d
149, 158–162 (CA4 2000) (en banc); *Harris* v. *Stovall*, 212
F. 3d 940, 943, n. 1 (CA6 2000); *Aycox* v. *Lytle*, 196 F. 3d
1174, 1177–1178 (CA10 1999); *James* v. *Bowersox*, 187
F. 3d 866, 869 (CA8 1999). And as this Court has ob-
served, a state court need not cite or even be aware of our
cases under §2254(d). *Early* v. *Packer*, 537 U. S. 3, 8
(2002) *(per curiam).* Where a state court's decision is
unaccompanied by an explanation, the habeas petitioner's
burden still must be met by showing there was no reason-
able basis for the state court to deny relief. This is so
whether or not the state court reveals which of the ele-

ments in a multipart claim it found insufficient, for §2254(d) applies when a "claim," not a component of one, has been adjudicated.

There is no merit to the assertion that compliance with §2254(d) should be excused when state courts issue summary rulings because applying §2254(d) in those cases will encourage state courts to withhold explanations for their decisions. Opinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court. Cf. *In re Robbins*, 18 Cal. 4th 770, 778, n. 1, 959 P. 2d 311, 316, n. 1 (1998) (state procedures limiting habeas are "a means of protecting the integrity of our own appeal and habeas corpus process," rather than a device for "insulating our judgments from federal court review" (emphasis deleted)). At the same time, requiring a statement of reasons could undercut state practices designed to preserve the integrity of the case-law tradition. The issuance of summary dispositions in many collateral attack cases can enable a state judiciary to concentrate its resources on the cases where opinions are most needed. See Brief for California Attorneys for Criminal Justice et al. as *Amici Curiae* 8 (noting that the California Supreme Court disposes of close to 10,000 cases a year, including more than 3,400 original habeas corpus petitions).

There is no merit either in Richter's argument that §2254(d) is inapplicable because the California Supreme Court did not say it was adjudicating his claim "on the merits." The state court did not say it was denying the claim for any other reason. When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. Cf. *Harris* v. *Reed*, 489 U. S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision ap-

pearing to rest on federal grounds was decided on another basis).

The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely. See, *e.g.*, *Ylst* v. *Nunnemaker*, 501 U. S. 797, 803 (1991). Richter, however, does not make that showing. He mentions the theoretical possibility that the members of the California Supreme Court may not have agreed on the reasons for denying his petition. It is pure speculation, however, to suppose that happened in this case. And Richter's assertion that the mere possibility of a lack of agreement prevents any attribution of reasons to the state court's decision is foreclosed by precedent. See *ibid.*

As has been noted before, the California courts or Legislature can alter the State's practices or elaborate more fully on their import. See *Evans* v. *Chavis*, 546 U. S. 189, 197, 199 (2006). But that has not occurred here. This Court now holds and reconfirms that §2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." Richter has failed to show that the California Supreme Court's decision did not involve a determination of the merits of his claim. Section 2254(d) applies to his petition.

## III

Federal habeas relief may not be granted for claims subject to §2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, §2254(d)(1); *Williams* v. *Taylor*, 529 U. S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, §2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, §2254(d)(2).

The Court of Appeals relied on the second of these ex-

ceptions to §2254(d)'s relitigation bar, the exception in §2254(d)(1) permitting relitigation where the earlier state decision resulted from an "unreasonable application of" clearly established federal law. In the view of the Court of Appeals, the California Supreme Court's decision on Richter's ineffective-assistance claim unreasonably applied the holding in *Strickland*. The Court of Appeals' lengthy opinion, however, discloses an improper understanding of §2254(d)'s unreasonableness standard and of its operation in the context of a *Strickland* claim.

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of §2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, *supra*, at 410. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough* v. *Alvarado*, 541 U. S. 652, 664 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this

Court." *Knowles* v. *Mirzayance*, 556 U. S. ___, ___ (2009) (slip op., at 9–10) (internal quotation marks omitted).

Here it is not apparent how the Court of Appeals' analysis would have been any different without AEDPA. The court explicitly conducted a *de novo* review, 578 F. 3d, at 952; and after finding a *Strickland* violation, it declared, without further explanation, that the "state court's decision to the contrary constituted an unreasonable application of *Strickland*." 578 F. 3d, at 969. AEDPA demands more. Under §2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. The opinion of the Court of Appeals all but ignored "the only question that matters under §2254(d)(1)." *Lockyer* v. *Andrade*, 538 U. S. 63, 71 (2003).

The Court of Appeals appears to have treated the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review: Because the Court of Appeals had little doubt that Richter's *Strickland* claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it. This analysis overlooks arguments that would otherwise justify the state court's result and ignores further limitations of §2254(d), including its requirement that the state court's decision be evaluated according to the precedents of this Court. See *Renico* v. *Lett*, 559 U. S. ___, ___ (2010) (slip op., at 11–12). It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See *Lockyer*, *supra*, at 75.

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, §2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf.

*Felker* v. *Turpin*, 518 U. S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under §2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson* v. *Virginia*, 443 U. S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

The reasons for this approach are familiar. "Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Calderon* v. *Thompson*, 523 U. S. 538, 555–556 (1998) (internal quotation marks omitted). It "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Reed*, 489 U. S., at 282 (KENNEDY, J., dissenting).

Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions. Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court. 28 U. S. C. §2254(b). If the state court rejects the claim on procedural grounds, the claim is barred in federal court

unless one of the exceptions to the doctrine of *Wainwright* v. *Sykes*, 433 U. S. 72, 82–84 (1977), applies. And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to §2254(d) set out in §§2254(d)(1) and (2) applies. Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding, see *id.,* at 90.

Here, however, the Court of Appeals gave §2254(d) no operation or function in its reasoning. Its analysis illustrates a lack of deference to the state court's determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system.

## IV

The conclusion of the Court of Appeals that Richter demonstrated an unreasonable application by the state court of the *Strickland* standard now must be discussed. To have been entitled to relief from the California Supreme Court, Richter had to show both that his counsel provided deficient assistance and that there was prejudice as a result.

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U. S., at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.,* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, at 687.

With respect to prejudice, a challenger must demon-

strate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla* v. *Kentucky*, 559 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 14). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U. S., at 689–690. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689; see also *Bell* v. *Cone*, 535 U. S. 685, 702 (2002); *Lockhart* v. *Fretwell*, 506 U. S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U. S., at 690.

Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is all the more difficult. The standards created by *Strickland* and §2254(d) are both "highly deferential," *id.*, at 689; *Lindh* v. *Murphy*, 521 U. S. 320, 333, n. 7 (1997), and when the two

apply in tandem, review is "doubly" so, *Knowles*, 556 U. S.,
at ___ (slip op., at 11). The *Strickland* standard is a gen-
eral one, so the range of reasonable applications is sub-
stantial. 556 U. S., at ___ (slip op., at 11). Federal habeas
courts must guard against the danger of equating unrea-
sonableness under *Strickland* with unreasonableness
under §2254(d). When §2254(d) applies, the question is
not whether counsel's actions were reasonable. The ques-
tion is whether there is any reasonable argument that
counsel satisfied *Strickland*'s deferential standard.

## A

With respect to defense counsel's performance, the
Court of Appeals held that because Richter's attorney had
not consulted forensic blood experts or introduced expert
evidence, the California Supreme Court could not rea-
sonably have concluded counsel provided adequate repre-
sentation. This conclusion was erroneous.

### 1

The Court of Appeals first held that Richter's attorney
rendered constitutionally deficient service because he did
not consult blood evidence experts in developing the basic
strategy for Richter's defense or offer their testimony as
part of the principal case for the defense. *Strickland*,
however, permits counsel to "make a reasonable decision
that makes particular investigations unnecessary." 466
U. S., at 691. It was at least arguable that a reasonable
attorney could decide to forgo inquiry into the blood evi-
dence in the circumstances here.

Criminal cases will arise where the only reasonable and
available defense strategy requires consultation with
experts or introduction of expert evidence, whether pre-
trial, at trial, or both. There are, however, "countless
ways to provide effective assistance in any given case.
Even the best criminal defense attorneys would not defend

a particular client in the same way." *Id.,* at 689. Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. *Ibid.* It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it. Here it would be well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts regarding the pool in the doorway to Johnson's bedroom.

From the perspective of Richter's defense counsel when he was preparing Richter's defense, there were any number of hypothetical experts—specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines—whose insight might possibly have been useful. An attorney can avoid activities that appear "distractive from more important duties." *Bobby* v. *Van Hook*, 558 U. S. \_\_\_, \_\_\_ (2009) *(per curiam)* (slip op., at 8). Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. See *Knowles*, *supra*, at \_\_\_ (slip op., at 14–15); *Rompilla* v. *Beard*, 545 U. S. 374, 383 (2005); *Wiggins* v. *Smith*, 539 U. S. 510, 525 (2003); *Strickland*, 466 U. S., at 699.

In concluding otherwise the Court of Appeals failed to "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id.*, at 689. In its view Klein's location was "the single most critical issue in the case" given the differing theories of the prosecution and the defense, and the source of the blood in the doorway was therefore of central concern. 578 F. 3d, at 953–954. But it was far from a necessary conclusion that this was evident

at the time of the trial. There were many factual differences between prosecution and defense versions of the events on the night of the shootings. It is only because forensic evidence has emerged concerning the source of the blood pool that the issue could with any plausibility be said to stand apart. Reliance on "the harsh light of hindsight" to cast doubt on a trial that took place now more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent. *Cone*, 535 U. S., at 702; see also *Lockhart*, 506 U. S., at 372.

Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it. The Court of Appeals opinion for the en banc majority rests in large part on a hypothesis that reasonably could have been rejected. The hypothesis is that without jeopardizing Richter's defense, an expert could have testified that the blood in Johnson's doorway could not have come from Johnson and could have come from Klein, thus suggesting that Richter's version of the shooting was correct and Johnson's a fabrication. This theory overlooks the fact that concentrating on the blood pool carried its own serious risks. If serological analysis or other forensic evidence demonstrated that the blood came from Johnson alone, Richter's story would be exposed as an invention. An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense. *Strickland*, *supra*, at 691. Here Richter's attorney had reason to question the truth of his client's account, given, for instance, Richter's initial denial of involvement and the subsequent production of Johnson's missing pistol.

It would have been altogether reasonable to conclude that this concern justified the course Richter's counsel pursued. Indeed, the Court of Appeals recognized this risk insofar as it pertained to the suggestion that counsel

should have had the blood evidence tested. 578 F. 3d, at 956, n. 9. But the court failed to recognize that making a central issue out of blood evidence would have increased the likelihood of the prosecution's producing its own evidence on the blood pool's origins and composition; and once matters proceeded on this course, there was a serious risk that expert evidence could destroy Richter's case. Even apart from this danger, there was the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether Johnson was telling the truth, or transform the case into a battle of the experts. Accord, *Bonin* v. *Calderon*, 59 F. 3d 815, 836 (CA9 1995).

True, it appears that defense counsel's opening statement itself inspired the prosecution to introduce expert forensic evidence. But the prosecution's evidence may well have been weakened by the fact that it was assembled late in the process; and in any event the prosecution's response shows merely that the defense strategy did not work out as well as counsel had hoped, not that counsel was incompetent.

To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates. All that happened here is that counsel pursued a course that conformed to the first option. If this case presented a *de novo* review of *Strickland*, the foregoing might well suffice to reject the claim of inadequate counsel, but that is an unnecessary step. The Court of Appeals must be reversed if there was a reasonable justification for the state court's decision. In light of the record here there was no basis to rule that the state court's determination was unreasonable.

The Court of Appeals erred in dismissing strategic considerations like these as an inaccurate account of counsel's actual thinking. Although courts may not in-

dulge "*post hoc* rationalization" for counsel's decisionmak-
ing that contradicts the available evidence of counsel's
actions, *Wiggins*, 539 U. S., at 526–527, neither may they
insist counsel confirm every aspect of the strategic basis
for his or her actions. There is a "strong presumption"
that counsel's attention to certain issues to the exclusion
of others reflects trial tactics rather than "sheer neglect."
*Yarborough* v. *Gentry*, 540 U. S. 1, 8 (2003) *(per curiam)*.
After an adverse verdict at trial even the most experienced
counsel may find it difficult to resist asking whether a
different strategy might have been better, and, in the
course of that reflection, to magnify their own responsibil-
ity for an unfavorable outcome. *Strickland*, however, calls
for an inquiry into the objective reasonableness of coun-
sel's performance, not counsel's subjective state of mind.
466 U. S., at 688.

2

The Court of Appeals also found that Richter's attorney
was constitutionally deficient because he had not expected
the prosecution to offer expert testimony and therefore
was unable to offer expert testimony of his own in re-
sponse.

The Court of Appeals erred in suggesting counsel had
to be prepared for "any contingency," 578 F. 3d, at 946
(internal quotation marks omitted). *Strickland* does
not guarantee perfect representation, only a "'reasonably
competent attorney.'" 466 U. S., at 687 (quoting *McMann*
v. *Richardson*, 397 U. S. 759, 770 (1970)); see also *Gentry*,
*supra*, at 7. Representation is constitutionally ineffective
only if it "so undermined the proper functioning of the
adversarial process" that the defendant was denied a fair
trial. *Strickland*, *supra*, at 686. Just as there is no expec-
tation that competent counsel will be a flawless strategist
or tactician, an attorney may not be faulted for a reason-
able miscalculation or lack of foresight or for failing to

prepare for what appear to be remote possibilities.

Here, Richter's attorney was mistaken in thinking the prosecution would not present forensic testimony. But the prosecution itself did not expect to make that presentation and had made no preparations for doing so on the eve of trial. For this reason alone, it is at least debatable whether counsel's error was so fundamental as to call the fairness of the trial into doubt.

Even if counsel should have foreseen that the prosecution would offer expert evidence, Richter would still need to show it was indisputable that *Strickland* required his attorney to act upon that knowledge. Attempting to establish this, the Court of Appeals held that defense counsel should have offered expert testimony to rebut the evidence from the prosecution. But *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.

In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. And while in some instances "even an isolated error" can support an ineffective-assistance claim if it is "sufficiently egregious and prejudicial," *Murray* v. *Carrier*, 477 U. S. 478, 496 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy. Here Richter's attorney represented him with vigor and conducted a skillful cross-examination. As noted, defense counsel elicited concessions from the State's experts and was able to draw attention to weaknesses in their conclusions stemming from the fact that their analyses were conducted long after investigators had left the crime scene. For all of these reasons, it would have been reasonable to find that Richter had not shown his attorney

was deficient under *Strickland*.

## B

The Court of Appeals further concluded that Richter had established prejudice under *Strickland* given the expert evidence his attorney could have introduced. It held that the California Supreme Court would have been unreasonable in concluding otherwise. This too was error.

In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong* v. *Belmontes*, 558 U. S. ___, ___ (2009) *(per curiam)* (slip op., at 13); *Strickland*, 466 U. S., at 693. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.*, at 696. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.*, at 693, 697. The likelihood of a different result must be substantial, not just conceivable. *Id.,* at 693.

It would not have been unreasonable for the California Supreme Court to conclude Richter's evidence of prejudice fell short of this standard. His expert serology evidence established nothing more than a theoretical possibility that, in addition to blood of Johnson's type, Klein's blood may also have been present in a blood sample taken near the bedroom doorway pool. At trial, defense counsel extracted a concession along these lines from the prosecution's expert. The pathology expert's claim about the size of the blood pool could be taken to suggest only that the wounded and hysterical Johnson erred in his assessment of time or that he bled more profusely than estimated. And the analysis of the purported blood pattern expert

indicated no more than that Johnson was not standing up when the blood pool formed.

It was also reasonable to find Richter had not established prejudice given that he offered no evidence directly challenging other conclusions reached by the prosecution's experts. For example, there was no dispute that the blood sample taken near the doorway pool matched Johnson's blood type. The California Supreme Court reasonably could have concluded that testimony about patterns that form when blood drips to the floor or about the rate at which Johnson was bleeding did not undermine the results of chemical tests indicating blood type. Nor did Richter provide any direct refutation of the State's expert testimony describing how blood spatter near the couch suggested a shooting in the living room and how the blood patterns on Klein's face were inconsistent with Richter's theory that Klein had been killed in the bedroom doorway and moved to the couch.

There was, furthermore, sufficient conventional circumstantial evidence pointing to Richter's guilt. It included the gun safe and ammunition found at his home; his flight from the crime scene; his disposal of the .32-caliber gun and of Johnson's pistol; his shifting story concerning his involvement; the disappearance prior to the arrival of the law enforcement officers of the .22-caliber weapon that killed Klein; the improbability of Branscombe's not being wounded in the shootout that resulted in a combined four bullet wounds to Johnson and Klein; and the difficulties the intoxicated and twice-shot Johnson would have had in carrying the body of a dying man from bedroom doorway to living room couch, not to mention the lack of any obvious reason for him to do so. There was ample basis for the California Supreme Court to think any real possibility of Richter's being acquitted was eclipsed by the remaining evidence pointing to guilt.

\*      \*      \*

The California Supreme Court's decision on the merits of Richter's *Strickland* claim required more deference than it received. Richter was not entitled to the relief ordered by the Court of Appeals. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

<hr>

No. 09–587

<hr>

## KELLY HARRINGTON, WARDEN, PETITIONER *v.* JOSHUA RICHTER

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

[January 19, 2011]

JUSTICE GINSBURG, concurring in the judgment.

In failing even to consult blood experts in preparation for the murder trial, Richter's counsel, I agree with the Court of Appeals, "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* v. *Washington*, 466 U. S. 668, 687 (1984). The strong force of the prosecution's case, however, was not significantly reduced by the affidavits offered in support of Richter's habeas petition. I would therefore not rank counsel's lapse "so serious as to deprive [Richter] of a fair trial, a trial whose result is reliable." *Ibid.* For that reason, I concur in the Court's judgment.