**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANCIS G. HERNANDEZ,
            *Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden,
California State Prison at San
Quentin,
            *Respondent-Appellee.*

No. 11-99013

D.C. No.
2:90-cv-04638-
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, Senior District Judge, Presiding

Argued and Submitted January 21, 2015
Pasadena, California

Filed December 29, 2017

Before: Harry Pregerson,[*] Stephen Reinhardt,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Nguyen

---

[*] Prior to his death, Judge Pregerson fully participated in this case and formally concurred in this opinion after deliberations were complete.

## SUMMARY[**]

### Habeas Corpus

The panel reversed the district court's denial of a writ of habeas corpus as to Francis Hernandez's guilt phase claims relating to first degree murder, vacated his convictions on those counts, and remanded.

The panel held that had counsel performed effectively and investigated and presented a diminished mental capacity defense based on mental impairment, there is a reasonable probability that at least one juror would have had a reasonable doubt as to whether Hernandez could have formed the requisite mental state for first degree murder.

Concurring in part and dissenting in part, Judge Nguyen wrote that even if the jury had considered the mental evidence of Hernandez's mental condition, there is no reasonable possibility of a different outcome, and would deny the habeas petition.

### COUNSEL

Tracy Casadio (argued) and Margo A. Rocconi, Deputy Federal Public Defenders; Sean K. Kennedy, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Gary Lieberman (argued) and Xiomara Costello, Deputy Attorneys General; Keith H. Borjon, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

**INTRODUCTION**

As in many capital cases, the facts involved in this case are deeply disturbing and the crimes brutal. In April 1983, a jury convicted Francis Hernandez of two counts of first degree murder, two counts of rape, and two counts of forcible sodomy. After finding that each murder occurred during the commission of rape and sodomy—special circumstances permitting capital punishment—the jury returned a verdict of death. The gruesome nature of the facts makes applying an objectively simple legal standard inherently difficult for any jurist, for as some astute observer will undoubtedly note someday, "bad facts make bad law."

The ultimate question in this case is whether there is a reasonable probability—that is, even less than a fifty-fifty chance—that at least one juror would have declined to convict Hernandez of *first degree* murder if his counsel had presented a diminished capacity defense based on mental impairment. Counsel failed to present this defense because he was ignorant of the law. As a result of his incompetence, the jury did not hear that Hernandez had suffered from a variety of mental impairments since childhood which stemmed from a genetic inheritance that all but guaranteed

that he would suffer severe mental illness, coupled with numerous in utero traumas, physical and sexual abuse at the hands of a psychotic adoptive mother, and head injuries from nearly a dozen motorcycle accidents. Most important, the jury was not told that such evidence, if believed, provided a legal defense to *first degree* murder. With respect to sentencing, the district court concluded that had the jury heard similar evidence during the penalty phase, there was a reasonable probability that at least one juror would have voted against the death penalty, and as a result it vacated Hernandez's death sentence. *Hernandez v. Martel*, 824 F. Supp. 2d 1025, 1120 (C.D. Cal. 2011).[1] A similar analysis leads us to conclude that had the jury been told of the evidence of Hernandez's mental impairments and that such evidence could as a matter of law provide a defense to *first degree* murder, at least one juror would have had reasonable doubt as to whether Hernandez could have formed the requisite mental state for that offense.[2] Put differently, our confidence in the outcome of Hernandez's trial is undermined: we believe it likely that at least one juror would have concluded that Hernandez suffered from the mental

---

[1] The state has not appealed the district court's decision to set aside the death penalty.

[2] The rape and sodomy convictions for which Hernandez has been sentenced to eight years to be served consecutively for a total of thirty-two years were affirmed by the state courts and are not challenged in the present habeas proceedings. Unlike first degree murder, the two felonies do not require specific intent and thus are not subject to a diminished capacity defense.

impairment required for a successful defense of diminished mental capacity.**[3]**

# BACKGROUND

## I. Factual Background

### A. Francis Hernandez

Francis Hernandez was born to a fourteen-year-old mother with a history of mental illness who abused drugs and was herself physically abused throughout her pregnancy. He inherited an "extremely strong predisposition" to "severe mental illness" with "psychiatric illness of psychotic proportions" going back three generations, including both his biological parents. These illnesses include schizophrenia, bipolar disorder, seizure disorder, and depression, in addition to an "extraordinary degree of chemical dependency."

Hernandez was adopted as a baby by Frank and Naomi Hernandez, who were no better situated to care for a child with special needs than were his biological parents. Naomi, diagnosed with schizophrenia, was episodically psychotic throughout Hernandez's childhood and was hospitalized at least ten times. After each hospitalization, she was too heavily medicated to care for her adopted son. She left the family when Hernandez was in middle school.

The experts who testified at his habeas hearing described Hernandez's childhood as "a daily hell," and rightly so. For

---

**[3]** Because Hernandez filed his federal habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), pre-AEDPA standards of review apply. *Carrera v. Ayers*, 699 F.3d 1104, 1106 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 2039 (2013).

discipline, Naomi would sit on Hernandez until he stopped struggling, slap him, tie him to chairs, chase him around the house with a baseball bat, and forcibly administer enemas to Hernandez twice a week. Frank suspected that Naomi sexually abused Hernandez. Frank also abused his adopted son, beating him with belts and leaving scars on his buttocks consistent with cigarette burns. Naomi was not spared from Frank's violence.

After Naomi left, Frank was largely absent. Drug dealers set up shop in the home, terrorizing Hernandez and supplying him with drugs and alcohol, which he began using in sixth grade. By fourteen or fifteen, he was declared a ward of the state. He was sentenced to the California Youth Authority in 1979, and upon his release, he discovered that Frank had sold the family home and left his adopted son an old van in which to live. One of those experts who testified at the evidentiary hearing reported that in the months leading up to the crimes Hernandez "was an eighteen-year-old, unemployed parolee who was homeless, isolated from his family, drug addicted, and living in a van."

## B. The Crimes

The nude bodies of Edna Bristol and Kathy Ryan were found five days apart near schools in Long Beach, California in the winter of 1981. Their injuries and causes of death were similar: both died of asphyxiation due to strangulation or suffocation and suffered unusual pre-mortem bruising and tearing in the anal and vaginal areas, suggesting a large object—consistent with a baseball bat—had been inserted. They both had bite marks on their breasts, and their pubic hair was singed. Ryan's abdomen had been cut in a tic-tac-toe pattern post-mortem.

Hernandez was arrested on February 4, 1981. After five hours and seventeen minutes of unrecorded interviews, he confessed to the crimes in a taped statement. Hernandez later claimed that he was willing to tell the police anything during the interview because they promised him psychiatric help.

In the taped confession, Hernandez said that on the night of Bristol's murder, he was drunk and "didn't have any control of myself. . . . I was in a crazy mood." He picked up Bristol hitchhiking but when he got lost, he got mad and stopped the van. When Bristol would not leave, he hit her and dragged her out of the vehicle. According to Hernandez, Bristol said "she'd do anything" so the two had consensual sex in the back of the van. He explained, "I didn't really have her—you know—forcibly. I guess maybe she thought I did, but I don't know." At some point, Bristol began kicking and screaming. In response, Hernandez "went bezerk [sic]." He taped her wrists, legs, and mouth, and "proceeded to fuck her in the ass." While doing so, he pushed Bristol against the hot engine cowling to burn her chest. Hernandez put his hand over her face to quiet her and "just might have left it there too long" until she stopped moving. He thought Bristol was still alive when he left her at the school, which he chose "so someone hopefully [would] find her." Before he left, he lit a cigarette and flicked matches onto Bristol's pubic hairs to hurt her for kicking him and damaging his van.

On the night of Ryan's murder, a group of young people, including Ryan and Hernandez, met in a local park before going to a pizza parlor to play pool. Four witnesses testified that Hernandez was drinking but did not appear very drunk. Hernandez told one of the witnesses that he wanted to make a "sandwich" out of Ryan and "fuck her in the butt until she

screams."  He told the witness, "You watch.  I'll get some tonight or tomorrow night."

In his taped confession, Hernandez not only talked about Bristol's death but about Ryan's.  He said that after the group gathering in the park and at the pizza parlor, Ryan told him to stop by her house to "go kick back for a little while" after the group disbanded.  When he arrived at her house, Ryan came outside and got in the van.  Hernandez suggested they make out, but Ryan was hesitant because Hernandez had a girlfriend.  Eventually, the two started kissing.  Hernandez thought the encounter was consensual: although "she was sort of hesitant at first," "she said oh, okay, cuz I pushed her arms back" and then "she took off her clothes."  The two had sex, but stopped when Ryan was "starting to bleed or starting her period or something."  When Ryan turned over, Hernandez thought she wanted to have anal sex, which they did until Hernandez stopped because Ryan said it hurt.  Like Bristol, Ryan started screaming and kicking, and Hernandez put a hand over her mouth to "keep her quiet."  He thought he "must have used too much pressure" because she "stopped struggling," but he did not realize she was dead until he took her body out of the van.  He then singed Ryan's pubic hair and cut her stomach with glass.  At the interviewer's prompting, Hernandez acknowledged that he "might" have bitten Ryan's nipple.  He added that, when he left Ryan's body, "it started dawning on [him] what had happened before with the other girl."  He said, "there was thoughts going through my head like, how the hell can I do these things, and—you know—I was thinking maybe I was doing it on purpose, I didn't know, you know, cause I hadn't been planning anything."

In addition to the taped confession, a variety of physical evidence linked Hernandez to the crimes.

## II.  Trial and Subsequent History

Hernandez's trial counsel tried to establish that Hernandez lacked the specific intent necessary for a conviction of first degree murder.  He based a diminished capacity defense solely on voluntary intoxication.  Counsel presented some evidence that Hernandez had been drinking on the nights of both murders as well as expert testimony that an alcoholic would not be able to form the specific intent to rape or kill.  Counsel also argued that in his intoxicated state, Hernandez had believed the encounters were consensual and had intended only to quiet the victims.

The jury found Hernandez guilty on two counts of first degree murder, two counts of rape, and two counts of forcible sodomy.  *People v. Hernandez*, 47 Cal. 3d 315, 351 (1988).  It found true six special circumstances.  The jury then imposed a sentence of death as to each murder.  For the rape and sodomy convictions, Hernandez received sentences of eight years to be served consecutively for a total of thirty-two years.  On direct appeal, the California Supreme Court in a reasoned opinion vacated one multiple-murder special circumstance charge but otherwise affirmed.  In the direct appeal, appellate counsel raised some arguments regarding trial counsel's ineffective assistance, but failed to raise a claim that counsel did not investigate or present a diminished capacity defense based on mental impairment.  *Id.* at 369.

## III.  Habeas Proceedings

In 1989, Hernandez filed a state habeas petition in the California Supreme Court, in which he raised the ineffective assistance of counsel claims at issue here.  The California Supreme Court summarily denied that petition.  Hernandez filed a timely federal habeas petition, and then returned to state court to exhaust his claims.  The California Supreme

Court summarily denied the second state habeas petition as untimely and on the merits, and Hernandez filed a timely amended federal petition. After granting in part the state's motion for summary judgment, the district court ordered a bifurcated evidentiary hearing on three juror misconduct claims and two ineffective assistance of counsel claims. This evidentiary hearing, all on written materials, lasted six years.

In 2011, the district court granted in part Hernandez's petition for writ of habeas corpus. It vacated the death penalty for several reasons, including counsel's failure to present mitigating mental health and social history evidence at the penalty phase. It denied, however, guilt phase relief. On appeal, the state has not challenged the grant of penalty phase relief. Hernandez, however, appeals his convictions on the first degree murder counts.

## JURISDICTION

The district court granted a certificate of appealability ("COA") on Hernandez's claim that his counsel was ineffective at the guilt phase for failing to call a key witness. It did not certify Hernandez's remaining ineffective assistance claims, including his claim that counsel was ineffective for failing to investigate or present a defense of diminished capacity based on mental impairment. We treat Hernandez's appeal from the district court's ruling on the uncertified issues as an application for a COA, Fed. R. App. P. 22(b)(2), and hereby grant the application pursuant to 28 U.S.C. § 2253(c)(2).

## STANDARD OF REVIEW

Hernandez filed his federal habeas petition before the enactment of the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"). Accordingly, pre-AEDPA standards of review apply. *Carrera v. Ayers*, 699 F.3d 1104, 1106 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 2039 (2013). "Ineffective assistance of counsel claims present mixed questions of law and fact." *Id.* We review the district court's partial denial of Hernandez's habeas petition, and its resolution of mixed questions of law and fact de novo; we review its findings of fact for clear error. *Id.*

## DISCUSSION

Hernandez contends that his counsel provided constitutionally ineffective assistance of counsel during the guilt phase of his trial by failing to investigate and present evidence in support of a diminished capacity defense based on mental impairment.**[4]** His petition specified counsel's errors in great detail. The district court concluded that Hernandez's counsel's performance was ineffective because he failed to know or to find out that a diminished capacity defense based on mental impairment was available under California law. As a result, he failed to develop "various materials gathered since trial but that were reasonably available to counsel before trial," including "records and background information regarding petitioner's birth family as well as social history information from petitioner's adopted family, preschool teacher and others." The district court concluded, however, that despite counsel's ineffective performance, Hernandez failed to show prejudice.

On this appeal, Hernandez must show both that his counsel was ineffective and that the district court erred in

---

**[4]** We review only this claim because in light of its disposition, we need review no other. We strongly doubt, however, that any other claim properly before us is meritorious.

finding that counsel's ineffective performance was not prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).

## I.  Deficient Performance

We agree with the district court that counsel was ineffective in not knowing or finding out that a diminished capacity defense based on mental impairment was available to Hernandez under California law and, based on that lack of knowledge, in failing to investigate and present such a defense.[5]

Deficient performance requires a showing that counsel's guilt phase performance "fell below an objective standard of reasonableness" at the time of the trial. *Strickland*, 466 U.S. at 688.  Defense counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *Id.* at 690.  However, deference to counsel is owed only to strategic decisions made after "thorough investigation of law and facts relevant to plausible options." *Id.*

## A.  We Consider Only Counsel's Stated Reason for His Challenged Conduct

As an initial matter, the parties dispute whether we consider counsel's stated reasons for the challenged course

---

[5] Hernandez contends that the district court's conclusion finding deficient performance "is not in dispute" because the government did not file a cross-appeal.  However, the government did dispute, in its brief on the uncertified issues, the district court's conclusion regarding deficient performance.  Accordingly, we consider whether counsel performed reasonably at the guilt phase—and agree with the district court that he did not.

of conduct or any hypothetical strategic reasons that could have supported the challenged course of conduct. Unlike many lawyers called to testify before a habeas court, Hernandez's counsel did not attempt to justify his failure to perform effectively by invoking a strategic decision on his part; rather, he admitted that he would have investigated and advanced the diminished capacity defense based on mental impairment had he realized that he could have done so. Citing *Harrington v. Richter*, 562 U.S. 86, 109 (2011), the state counters that counsel's "subjective state of mind is irrelevant" to our analysis, and asserts that "a reasonable defense attorney *could have* decided to present a guilt-phase defense based on intoxication alone" because the experts who examined Hernandez before trial were either inconclusive or found that Hernandez could have formed the requisite intent, and there was "potentially damaging psychiatric evidence that Hernandez was a sociopath." Hernandez argues in response that the state's proffered explanations for counsel's conduct are "mere post-hoc rationalization with no place in the analysis."

Hernandez is correct. Where counsel has provided the reason for his conduct, and we have no reason to doubt the validity of that explanation, the relevant inquiry is whether the stated reason was objectively unreasonable. The Supreme Court has repeatedly declared that courts are not to "indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Richter*, 562 U.S. at 109 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003)). As a result, "we credit the statements of defense counsel as to whether their decisions at trial were—or were not—based on strategic judgments." *Doe v. Ayers*, 782 F.3d 425, 445 (9th Cir. 2015). In *Doe*, trial counsel "unequivocally said" that he did not have a strategy in failing to investigate extensive

mitigating evidence. *Id.* at 444. We concluded that to apply the presumption that counsel acted reasonably in such a case would "contradict [trial counsel's] testimony rather than fill[] a gap in memory, contravening the Supreme Court's admonition" against *post hoc* rationalizations in *Harrington* and *Wiggins*. *Id.* at 445 (quoting *Heishman v. Ayers*, 621 F.3d 1030, 1040 (9th Cir. 2010)) (alterations in original); *see also Duncan v. Ornoski*, 528 F.3d 1222, 1237 n.7 (9th Cir. 2008) (explaining that "[i]n light of the Supreme Court's admonitions that reviewing courts may not substitute their own strategic reasoning for that of trial counsel in order to find that counsel's performance was justified, we [would] not consider [the district court and state's] additional speculative justifications to be [counsel's] *actual* reasons for declining to test [petitioner's] blood" (citing *Wiggins*, 539 U.S. at 526–27)).

Only where counsel's conduct is not explained in the record, or the explanation contradicts the record, do we "entertain the range of possible reasons [] counsel *may* have had for proceeding as he did." *Leavitt v. Arave*, 646 F.3d 605, 609 (9th Cir. 2011); *Richter*, 562 U.S. at 109 (finding, under AEDPA, that court of appeals erred in dismissing range of strategic considerations where counsel provided *no* reason for course of conduct); *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (directing court of appeals "to affirmatively entertain the range of possible 'reasons'" where counsel could not recall and the record was ambiguous as to the extent of penalty-phase investigation).

Were the record ambiguous or silent as to why Hernandez's counsel did not present the diminished capacity defense, we might consider the state's hypothetical strategic reasons. But it is not, and we don't. In the habeas proceedings before the district court, counsel said exactly

why he failed to pursue the defense: he did not know that he could and did no research to uncover his mistake of law. The state, moreover, suggested no credible basis for doubting the truth of Hernandez's counsel's statements. Finally, the district judge found the statements credible and that finding was not clear error.

## B. Mistakes of Law Constitute Deficient Performance

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014); *see also Morris v. California*, 966 F.2d 448, 454–55 (9th Cir. 1992) (finding that counsel provided "clearly deficient performance" because he was not "familiar with the law" and had not "done his homework" to become familiar with the relevant law). In *United States v. Span*, 75 F.3d 1383 (9th Cir. 1996), we held that a mistake about the availability of a defense constitutes a mistake of law that gives rise to deficient performance. In that case, trial counsel failed to request a jury instruction that would cover an excessive force defense because he mistakenly believed the unlawful arrest jury instruction would include excessive force. *Id.* at 1390. This was deficient performance because his "errors with the jury instructions were not a strategic decision to forego one defense in favor of another," but rather "the result of a misunderstanding of the law." *Id.* No "strategy, save an ineffective one, would lead a lawyer to deliberately omit" his client's best defense. *Id.*

So, too, here. Hernandez's counsel's failure to investigate and present a diminished capacity defense based on mental impairment—what the district court recognized as Hernandez's "best possible defense"—was "quintessential"

deficient performance. His counsel was simply wrong that evidence of mental impairment would not support a diminished capacity defense. Doing even minimal homework, he would have learned that at the time of the crimes, California recognized a diminished capacity defense where "someone [] is unable, because of intoxication *or mental illness*, to comprehend his duty to govern his actions in accord with the duty imposed by law." *People v. Saille*, 54 Cal. 3d 1103, 1110–11 (1991) (emphasis added) (citing *People v. Conley*, 64 Cal. 2d 310, 322 (1966)); *see also People v. McDowell*, 69 Cal. 2d 737, 746–47 (1968) (describing the diminished capacity defense based on "mental abnormality" as "settled" and "commonplace"). In *McDowell*, for instance, the California Supreme Court held that trial counsel was constitutionally deficient for failing to present a diminished capacity defense based on "mental abnormality" because he erroneously believed the defense was limited to a defendant's "sexual propensities." 69 Cal. 2d at 747. Because of Hernandez's counsel's failure to determine the applicable law, counsel did not present the "substantial credible evidence" of the defendant's mental health that could have negated his intent at the time of the crimes. *Id.* at 749.

## II. Prejudice

Although the district court found that Hernandez's counsel performed incompetently, it concluded that his deficient performance did not prejudice Hernandez. That conclusion is in error.

To establish prejudice, Hernandez must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* Court specifically rejected a preponderance of the

evidence standard.  *Id.* at 693.  Instead, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 694–95.  "[B]ecause the jury was required to reach a unanimous verdict on each count, the outcome could have differed if even 'one juror would have struck a different balance.'"  *Weeden*, 854 F.3d at 1071 (quoting *Wiggins*, 539 U.S. at 537).  For guilt-phase claims, we contrast "the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately."  *Daniels v. Woodford*, 428 F.3d 1181, 1201 (9th Cir. 2005) (citing *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995)).  We then ask whether that omitted evidence might have created reasonable doubt in the mind of at least one reasonable juror.  *Rios v. Rocha*, 299 F.3d 796, 813 (9th Cir. 2002).

Hernandez's jury was presented with two paths to first degree murder: willful, deliberate, and premeditated murder, or felony murder with rape as the predicate felony.[6]  Under the first theory, the jury was required to find that the killing was intentional, willful, deliberate, and premeditated with malice aforethought.  *Conley*, 64 Cal. 2d at 318–19.  Under the second, the jury was required to find that Hernandez had the specific intent to commit the predicate felony of rape. *Hernandez*, 47 Cal. 3d at 346.  At the time of Hernandez's trial, evidence of diminished capacity could negate the existence of a specific mental state essential to an offense,

---

[6] At the time, sodomy constituted a predicate offense for second degree, rather than first degree, murder.

including malice aforethought and specific intent. *People v. Poddar*, 10 Cal. 3d 750, 757 (1974), *superseded by statute*; *see also Saille*, 54 Cal. 3d at 1110. A successful diminished capacity defense would therefore have reduced the first degree murder convictions to a lesser offense under either theory by establishing that Hernandez lacked the capacity to form the requisite mental state of either malice aforethought or specific intent to rape.[7] *Poddar*, 10 Cal. 3d at 758 n.11.[8]

Accordingly, we must determine whether there is a reasonable probability that at least one juror, upon hearing the evidence of diminished capacity based on mental impairment, would have concluded that the prosecution had failed to carry its burden of proof regarding Hernandez's mental state and, as a result, declined to vote to convict Hernandez of first degree murder.

## A. The Evidence Presented at Trial

Counsel presented three reasons why Hernandez lacked the requisite mental state necessary for first degree murder: (1) he had intended to quiet, not kill the victims; (2) he believed in his intoxicated state that the sex was consensual; and (3) he was unable to form specific intent based on a diminished capacity defense due to intoxication. These were

---

[7] We refer hereafter, for convenience, to both malice aforethought and specific intent by the term "specific intent." For purposes of this opinion, both have the identical legal effect and consequence.

[8] At the time of Hernandez's trial, diminished capacity was a defense only to crimes of specific intent. *People v. Wetmore*, 583 P.2d 1308, 1314 n.9 (Cal. 1978), *superseded by statute*. Therefore, a successful diminished capacity defense would not undo the convictions for rape or sodomy because the offenses themselves are general, not specific, intent crimes. The defense could, however, if successful, preclude the two felonies from serving as a predicate to a felony murder charge.

undeniably all weak defenses. There was little evidence to support Hernandez's claim that he attempted to quiet the victims beyond his own confession, and the physical evidence of forcible rape and sodomy was compelling.

The California Supreme Court emphasized that the diminished capacity defense based on intoxication was equally weak. *Hernandez*, 47 Cal. 3d at 350–51. Hernandez's counsel presented only uncorroborated testimony that Hernandez was intoxicated the night of Bristol's killing, and four witnesses testified that he did not appear very drunk on the night of Ryan's killing. After testifying that Hernandez was an alcoholic who would not be capable of forming the requisite intent for first degree murder, Hernandez's expert, Dr. Amer Rayyes, conceded on cross-examination that it would be possible for an alcoholic to form the specific intent to kill, rape, or sodomize while drinking.

We have emphasized that we are particularly likely to find prejudice from a failure to present a mental defense "where the defense that was presented at trial was weak or meritless." *Daniels*, 428 F.3d at 1207; *see also Jennings*, 290 F.3d at 1019 (same). Here, it unquestionably was both.

## B. The Evidence that Could Have Been Presented at Trial

The picture the jury received of Hernandez was of a man who, as the prosecution said in closing, "is out to hurt people," and who was maybe a little drunk the night of the crimes. That picture was woefully incomplete. Counsel failed to pursue and present what the district court recognized as "the best possible defense at guilt: that due to mental deficiency, neurological deficits and inadequate

parenting, petitioner lacked the capacity to form the specific intent to rape and kill his victims."

At the time of Hernandez's trial, a diminished capacity defense based on mental health included, among other factors, consideration of a defendant's biological background, familial history of mental illness, social history, living situation prior to the crime, and potential neurological impairments. *See McDowell*, 69 Cal. 2d at 741–43. Evidence supporting all of these considerations was readily available to Hernandez's counsel had he only looked.

During the district court's evidentiary hearing, several witnesses testified to what counsel could have found and presented had he understood that a mental defense based on diminished capacity was available. Psychologist Dr. Clausen, psychiatrist Dr. Lewis, and criminologist Sheila Balkan provided detailed social histories of Hernandez, relying on interviews with Hernandez, family, friends, and teachers as well as on various records including adoption and medical records, and psychological assessments from 1967, 1979, and 1982. Neuropsychologist Dr. Gur, who reviewed similar materials and administered a series of neurological tests, also testified on behalf of Hernandez. The state presented only the testimony of clinical psychologist Dr. Martell, who also interviewed Hernandez.

Dr. Lewis explained, "[i]t is impossible to understand Francis Hernandez's psychiatric condition . . . without a clear understanding among his genetic vulnerabilities to severe mental illness which he inherited from his biological mother and father, the effects of in utero exposure to alcohol and drugs, repeated head injuries beginning in early childhood, and an upbringing in a psychotic, physically and sexually abusive, and severely neglectful adoptive family." Hernandez's social history reveals a biological "prescription

for disaster." The in utero injuries—stemming from his mother's drinking and abuse throughout the pregnancy—combined with the use of forceps during Hernandez's delivery contributed to his "neurological and psychological vulnerabilities."

The experts identified significant parallels between the crimes and the extreme abuse Hernandez suffered. In addition to suspected sexual abuse, his adoptive mother would sit on Hernandez, tie him to chairs, chase him around the house with a baseball bat, and forcibly administer enemas to Hernandez twice a week—a practice Dr. Lewis described as "a form of sodomy." Dr. Lewis explained, "Children who have had objects shoved into their rectums repeatedly against their will are at high risk of perpetrating similar acts on others." In addition, it is significant with respect to the victims' pubic hair that Hernandez burned that he himself has scars on his buttocks consistent with cigarette burns.

Experts Clausen, Lewis, Balkan, and Gur diagnosed Hernandez with dissociative disorder, bipolar disorder, organic brain damage, and impaired reality testing.

The experts concluded that Hernandez had begun dissociating in childhood to cope with trauma. Dr. Gur explained that dissociation can lead to "a state in which a person can engage in a complex set of behaviors without intent or premeditation." Evidence of Hernandez's dissociation include his inability to remember traumatic "watershed events" from childhood, and friends' descriptions of "spells" in which Hernandez would become "non-responsive" and unaware of his surroundings. Hernandez himself described elementary school fights in which he "would find himself thirty feet from where he last remembered being." The experts concluded that

dissociation accounted for why Hernandez appeared to know what happened during the crimes, but did not remember portions of his actions.

Dr. Lewis also diagnosed Hernandez with bipolar disorder. She believed that at the time of the crimes, Hernandez was in a "manic or hypomanic state" while simultaneously experiencing dissociative symptoms.

In addition, Dr. Gur concluded that Hernandez had organic brain damage, probably reflecting a neurodevelopment disorder exacerbated by Hernandez's perinatal stressors as well as postnatal head injuries. In addition to the in utero abuse and use of forceps during his birth, Hernandez suffered "sequential head injuries" that "exacerbate existing psychiatric illness" and make one "especially susceptible to the effects of alcohol." His adoptive father purchased Hernandez an adult motorbike when he was five and Hernandez was involved in a dozen motorcycle accidents that sent him to the hospital, including one at age 17 in which he lost consciousness and went into convulsions. After administering psychological tests, Dr. Gur testified that Hernandez's results were "highly abnormal" and that he hadn't "seen profiles like that in a long time." When he had, "they've always been associated with severe brain damage."

Drs. Clausen, Lewis, and Gur all emphasized that from an early age, Hernandez exhibited impaired reality testing, or difficulty interpreting and responding to others' emotions. His preschool teacher noted that Hernandez was incapable of interpreting social cues and that he misinterpreted any action as a threat. The psychologist who evaluated Hernandez in relation to his adoptive family's unsuccessful attempt to adopt a second child in 1967 found that Hernandez "phantasized [sic] so profusely that he is unable

to readily accept reality." Dr. Clausen found the origins of Hernandez's misperception of emotion in his genetic predispositions as well as his exposure to his adoptive parents' psychological problems. Dr. Gur concluded that Hernandez's brain damage most likely caused Hernandez to misperceive the victims as consenting to sex.

All experts but Dr. Martell, whom the district judge thought not credible, concluded that due to these mental impairments, Hernandez lacked the capacity to form the specific intent necessary to support a first degree murder conviction. Further, Dr. Gur testified that a comprehensive neuropsychological evaluation at the time of the trial would have disclosed the mental impairments identified by himself and the others.

## C. Ninth Circuit Precedent Demonstrates that the Ineffective Performance in this Case Was Prejudicial

We have repeatedly held that defense counsel in a first-degree murder trial was prejudicially ineffective where there was some evidence of the defendant's mental impairments in the record, but counsel failed to investigate and present a mental impairment defense to the charge. *See, e.g.*, *Daniels*, 428 F.3d at 1208 (holding that counsel's failure to investigate and present evidence of petitioner's "severe mental illness and possible brain damage" at the guilt phase was prejudicial because "[u]nder the diminished capacity standard, a jury could well have found that he did not have the capacity to truly premeditate and understand the gravity" of the offense); *Jennings*, 290 F.3d at 1010, 1014–16 (holding that where "trial counsel failed adequately to investigate and present considerable evidence regarding petitioner's psychological and family history that might have . . . defeated the jury's finding of the requisite intent for first degree murder in the guilt phase," defendant was denied

effective assistance of counsel); *Seidel v. Merkle*, 146 F.3d 750, 755–56 (9th Cir. 1998) (holding that petitioner was prejudiced where "trial counsel failed to conduct any investigation at all into his client's psychiatric history and therefore neglected to pursue a potentially successful defense" at the guilt phase).

None of the evidence described in section II(B), *supra*, was put before the jury and considered during its deliberations. The testimony from these qualified experts would have added an entirely new dimension to the jury's assessment of the critical issue of Hernandez's mental state. The jury did not have the benefit of testimony regarding Hernandez's numerous head injuries or his genetic predisposition to mental illness, his traumatic childhood raised in a violent and psychotic adoptive family, his organic brain damage, and his history of dissociation and impaired reality testing. Instead, the jury was simply asked to find, based on weak or uncorroborated evidence, that because Hernandez might have been intoxicated, he could not form the specific intent to rape or kill the two victims. It is "especially egregious" to forgo investigation when "the entire defense strategy rest[s] on contesting the intent element of the crime, a defense which could have benefited enormously from readily available psychiatric evidence." *Turner v. Duncan*, 158 F.3d 449, 456–57 (9th Cir. 1998).

We conclude that there is a reasonable probability that, upon hearing Hernandez's "best defense" of mental impairment, at least one juror, and probably more, would have harbored substantial doubt about Hernandez's capacity to form the specific intent to rape or kill. Thus, our confidence in the verdict is, without question, undermined.

## D. The Arguments to the Contrary Do Not Change Our Conclusion that Hernandez Was Prejudiced

None of the arguments that the district court or the state offer to the contrary causes us to alter our conclusion.

The district court provided three primary reasons for its conclusion that Hernandez was not prejudiced: (1) the level of detail in Hernandez's confession could have caused the jury to reasonably reject a defense that he lacked the capacity to form the requisite intent due to mental defect; (2) the victims suffered very similar injuries just days apart, suggesting some amount of premeditation or deliberation; and (3) the fact that California voters elected to abolish the diminished capacity defense eighteen months before Hernandez's trial could make a jury less likely to accept the defense.[9]

Without a doubt, Hernandez's taped confession is detailed and disturbing. However, the experts at the habeas hearing agreed that Hernandez's "ostensible recollection of details on the tape" does not rule out a diminished capacity defense. Instead, as they testified, his taped confession

---

[9] The district court's third reason was entirely inappropriate: in assessing prejudice, the judge should not have considered the abolition of the diminished capacity defense in Proposition 8, adopted over one year before the trial. In *Strickland*, the Court emphasized that "[i]n making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law." 466 U.S. at 695. At the time of Hernandez's trial, it was indisputably the law that the diminished capacity defense was available where the crimes predated the initiative, as they did in Hernandez's case. As such, the political context surrounding the diminished capacity defense should have absolutely no bearing on whether the jury would follow the law or whether Hernandez was prejudiced.

confirms their view that Hernandez experienced mental impairments during the crimes because his statements demonstrate "that his thought processes were psychotic during the crimes." At one point, Hernandez explained, "it was some way I wasn't even feeling that I did it," which suggested that he did not understand what he was doing or thinking during the crimes. When the police asked what thinking about these events made Hernandez feel, he responded, "I think I need psychiatric help. Definitely. Cause I don't know what would make me do this." Within the greater context of Hernandez's biological background and horrific upbringing, and expert testimony pointing out the evidence of psychosis buried in the confession, we do not find the district court's first point persuasive.

Second, the district court pointed to the fact that the victims suffered very similar injuries days apart to suggest that any diminished capacity defense would have been undermined by this evidence of premeditation and deliberation. Dr. Gur, however, explained that mental impairments such as Hernandez's could cause a person to "engage in a complex set of behaviors without intent or premeditation." The result may be "highly organized if somewhat ritualistic behavior." In effect, the sheer bizarreness of the nearly identical crimes just days apart would have supported, rather than undermined, a diminished capacity defense based on mental impairment. So, too, would the seemingly irrational post-mortem injuries to the victims' bodies. Most important, with Hernandez's harrowing childhood placed in context, a juror could have reasonably concluded, like the experts who testified at the habeas hearing, that the nearly identical injuries of both victims reflected not premeditation, but rather Hernandez's own, similar history of abuse at the hands of his adoptive parents, from the forcible sodomy to the genital burns, such

that the similarity of his actions were a product of his abuse and mental impairments.

This Court has recognized the power of a diminished capacity defense to overcome even "[s]ubstantial evidence supporting a finding of premeditation and deliberation." *Daniels*, 428 F.3d at 1207–08 (alterations in original) (quoting *People v. Cruz*, 605 P.2d 830, 835 (Cal. 1980)); *see also Bloom v. Calderon*, 132 F.3d 1267, 1269, 1273, 1276 (9th Cir. 1997) (finding prejudice where counsel failed to present evidence of brain damage, schizotypal personality disorder, and transient psychotic episodes, notwithstanding evidence that petitioner planned the murder of his family in advance). Thus, however similar the crimes or detailed the taped statement, there is a reasonable probability that, hearing all of the expert evidence in support of a diminished mental capacity defense, a juror would have harbored reasonable doubt on the element of specific intent and, thus, on the counts of first degree murder.

The state offers two additional arguments that also do not affect our conclusion: one, that any psychiatric testimony would have been rebutted by a prosecution expert such as Dr. Martell and, two, that any additional evidence of impairment would have been cumulative.

First, while this Court takes into account the possibility of any rebuttal evidence that could have been admitted when evaluating prejudice, *Richter*, 562 U.S. at 109, the district court found that Dr. Martell—the state's rebuttal expert—was neither credible nor qualified. The state cites *Jones v. Ryan*, 583 F.3d 626 (9th Cir. 2009), *vacated on other grounds and remanded*, 563 U.S. 932 (2011), for the proposition that it was "improper [for the district court] to weigh the testimony of the experts against each other in order to determine who was the most credible." That

quotation, however, is taken out of context and has no relevance here, because *Jones* reaffirmed the well-established principle that in order to determine whether the failure to offer evidence was prejudicial, the judge must determine the probable effect of such evidence upon the jury, including how he believes the *jury* would assess the credibility of the witnesses. *See* 583 F.3d at 641. That is what the district judge did here by finding Dr. Martell not credible as part of his prejudice analysis. While we do not agree with the district judge's ultimate conclusion regarding prejudice, we do agree that, for the reasons he stated, a jury probably would have found Dr. Martell's testimony unpersuasive.

Second, contrary to the state's assertion, and for the reasons discussed throughout this opinion, the evidence of mental impairment clearly would not have been cumulative of the weak evidence of intoxication that Hernandez's counsel presented.

## CONCLUSION

The jury in Hernandez's trial heard the gruesome facts of the crimes and was asked to find that Hernandez acted in a diminished capacity because of weak evidence that he might have been intoxicated. What it did not hear, solely because his counsel was ignorant of the law, was that Hernandez had suffered from neurological impairments since childhood, dissociating to cope with the trauma of being raised and abused by a psychotic mother and struggling to comprehend others' emotions; that he suffered persistent and pervasive abuse that bore a striking resemblance to that which he inflicted upon the victims; that he sustained head injuries from nearly a dozen motorcycle accidents, some of which occurred upon a motorcycle given to him when he was five years old; and that he inherited a

genetic "prescription for disaster," all but guaranteeing that he would have some neurological impairments as a result of a staggering legacy of mental illness and addiction in his biological family. We conclude that had counsel performed effectively and investigated and presented a diminished mental capacity defense based on mental impairment, there is a reasonable probability that at least one juror would have had a reasonable doubt as to whether Hernandez could have formed the requisite mental state for first degree murder.

We reverse the district court's denial of a writ of habeas corpus as to Hernandez's guilt phase claims relating to first degree murder, vacate Hernandez's convictions on those counts, and remand with instructions to grant the petition for a writ of habeas corpus unless the state conducts a new trial on those charges within a reasonable period of time.

---

NGUYEN, Circuit Judge, concurring in part and dissenting in part:

In January 1981, Francis Hernandez brutally raped, sodomized, strangled to death, and mutilated Edna Bristol, throwing her naked body out of his van near a middle school in Long Beach, California. Five days later, and in a strikingly similar manner, Hernandez raped and killed Kathy Ryan, throwing her naked body on the lawn of a high school in the same city. After his arrest, Hernandez gave a comprehensive, graphic, and disturbing confession, walking the police through the details of his gruesome crimes and, importantly, his thoughts, anger, and awareness of his actions as he committed them. His admissions, along with substantial physical evidence connecting him to the crimes, amply supported the jury's guilty verdicts.

Yet despite the strength of the evidence, the majority now vacates Hernandez's first degree murder convictions on the ground that Hernandez suffered prejudice due to trial counsel's deficient performance. I strongly disagree. Even if the jury had considered the omitted evidence of Hernandez's mental condition, there is no reasonable possibility of a different outcome. It's not even a close call. The evidence that Hernandez had specific intent to rape and kill, either of which could have independently supported the verdicts, was so overwhelming that no rational juror would have believed otherwise. I dissent.

## I.

In order to prevail, Hernandez must show a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (emphasis added). To determine if there is a reasonable probability of a different outcome, we compare "the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001)).

While a reasonable probability is "less than the preponderance more-likely-than-not standard," *Summerlin v. Schriro*, 427 F.3d 623, 640 (9th Cir. 2005) (en banc) (citing *Strickland*, 466 U.S. at 693–94), "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding[,]'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). Hernandez faces a higher burden of showing prejudice at the guilt phase than at his death penalty sentencing, where

prejudice has been established without appeal by the government. *See Raley v. Ylst*, 470 F.3d 792, 802 (9th Cir. 2006) ("The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases.").

Hernandez also must show a reasonable probability of a different outcome as to *both* first degree murder theories that were available to the jury: 1) willful, deliberate, and premeditated murder, and 2) felony murder with rape as the predicate felony. That is because, as the majority acknowledges, the jury was presented with two independent paths to first degree murder. While the jury was required to find that the killing was willful, deliberate, premeditated and with malice aforethought under the first theory, it needed only to find that Hernandez had the specific intent to rape under the second theory of felony murder. *See People v. Hernandez*, 47 Cal. 3d 315, 346–47, 348–51 (1988).

## II.

### A. The Jury Heard Overwhelming Evidence of Hernandez's Specific Intent to Rape and Kill both Bristol and Ryan

Ample evidence of Hernandez's specific intent to rape and kill both Bristol and Ryan supported the jury's verdict. First, the two crimes were committed within days of each other and were strikingly similar, strongly suggesting premeditation. Bristol and Ryan were around the same age—21 and 16, respectively—and both had shoulder-length blonde hair and similar body types. *Hernandez*, 47 Cal. 3d at 328, 341. Both women were enticed into Hernandez's van, raped, and sodomized. Hernandez taped Bristol's wrists, ankles, and mouth with duct tape; tape was also found near Ryan's body. *Id.* at 328. According to pathologist

testimony, each victim was subjected to "extremely similar and extremely rare" wounds to the vagina and anus, likely caused by forcible insertion of a large object, possibly a baseball bat. After each woman struggled and screamed, Hernandez strangled each of them. Both women were found in the early morning hours, their bodies abandoned near schools on grassy parkways. Their bodies bore other similar injuries—wounds inflicted by punches to the mouth, significant bruising around their necks, bite marks on their breasts, "puncture-wound type injuries to the nipples," and "singed or burned pubic hair." The injuries "carried significant sexual overtones," and "specifically sexual violence [was] repeated in almost every detail with both victims." *Id.* at 350. Both women were found naked and lying on their backs, and Hernandez threw both of their clothes out of his van after driving away from their bodies. The substantial similarities between the crimes showed that Hernandez intended and premeditated both rapes and murders. *Cf. id.* at 341 (characterizing the offenses as "'signature' crimes—because of the unique nature of each killing it was reasonable to believe the same person committed them both").

Second, Hernandez's own words during his confession showed his intent. He explained the beginning of his attack on Bristol as follows:

> [Bristol] started telling me about all her problems, *and I was mad, and I told her not to tell me about her problems*, and then she started bitching, and I just stopped my van.[1]

---

[1] The majority summarizes this portion of Hernandez's confession as follows: "He picked up Bristol hitchhiking but when he got lost, he got mad and stopped the van." Opinion at 7. This is a

> I got out, walked around and told her to get
> out, and she wouldn't get out, so I hit her, and
> I dragged her out of my van, *and then she told
> me that she'd do anything, and I thought
> about that for a minute*, and – I don't know it
> was just that I was drunk and I was in a weird
> mood, and I just took her and I threw her in
> the back . . . and then I told her to get out and
> get in the front . . . and I proceeded to drive
> . . . on the Long Beach Freeway[.]

(Emphasis added.)   Hernandez then parked at a separate location and told Bristol to "get in the back" and "to take off her clothes."   There was no exit from the back of the van, as a passenger would have to climb through the driver's side door to get out of the vehicle.  *Hernandez*, 47 Cal. 3d at 345 n.18.  Hernandez described what happened next:

> [S]he did, she was willing, and sat there, [we]
> had sexual intercourse once, then I was
> getting up and *getting ready to let her go*, and
> *I didn't really have her—you know—forcibly.
> I guess maybe she thought I did but I don't
> know*—you know.  I proceeded to get up and
> get my clothes on, and *I was going to let her
> out*.

(Emphasis added.)   While Hernandez tried to minimize his conduct by claiming that they had consensual intercourse, his statement reveals, in several respects, his awareness of Bristol's lack of consent and his specific intent to rape her—

mischaracterization of Hernandez's statement.   While he mentions getting lost, Hernandez clearly connects his anger to Bristol's continued discussion of her problems.

pondering her plea that she would "do anything;" driving to a different location; ordering her to get into the back of the van and take off her clothes; and, after raping her, admitting that he was preparing to "let her go" or "let her out."

Tragically, Hernandez's violence only increased as the evening progressed. Bristol struggled against Hernandez, kicking him and kicking a hole in the door of his van. This made Hernandez go "bezerk," and, in his own words:

> I just threw her over, taped her up . . . I taped her wrists. I taped her legs . . . [a]round the ankles, and then I taped her around the hair, and then I proceeded to fuck her in the ass. . . . [A]nd then I told her that if she was good after that; I told her if she was going to be cool, I'd let her up and I was going to let her go, and then when I let her up, she started just kicking and hitting, and kicking and hitting me, so I just put my hand over her and I grabbed some piece of material . . . I pushed that over her face . . . and then—uh—she stopped moving.

Hernandez also admitted to "forc[ing] [Bristol] up against the hot engine cowling of the van in order to burn her breasts" during the forcible sodomy. *Hernandez*, 47 Cal. 3d at 332. His motivation was clear by his own admission: he suffocated Bristol as punishment for not "being cool" after he violently raped and sodomized her. And the acts Hernandez took to render Bristol "totally defenseless"— attacking her in the back of the van, from which she could not escape, and taping her arms, legs, and mouth—also suggested premeditation and intent to kill. *See Crittenden v. Ayers*, 624 F.3d 943, 963 (9th Cir. 2010) (viewing

petitioner's gagging and tying of his victims as evidence of premeditation supporting a first degree murder conviction). In fact, Bristol's wrists and ankles "had been bound so tightly that there were ligature marks on the skin and hemorrhage in the underlying tissues." *Hernandez*, 47 Cal. 3d at 344–45.

Hernandez's confession contains even more compelling details of his intent to rape and murder Ryan. Ryan and Hernandez were friends, and spent time together in a group the evening of her death. The California Supreme Court described Hernandez's actions that evening as follows:

> During the evening of playing pool and drinking beer, it was evident to several in the group that defendant was focusing considerable unwelcome attention on Ryan. He tried to put his arms around her, pinched her in the buttocks and put his hands on her hips, but she kept pushing him away. . . . Outside, defendant told Jackson he wanted to make a 'sandwich' out of Ryan; he wanted to 'fuck her in the butt until she screams.' He told Jackson he would 'get some tonight or tomorrow night.'

*Hernandez*, 47 Cal. 3d at 329–30.[2] Hernandez's aggressive unwanted sexual touching of Ryan at the bar, and his stated

---

[2] Ryan's stepmother also testified to suspicious circumstances surrounding her daughter's room. The morning after Ryan's death, her stepmother found "the lights still on and the drapes and the sliding glass door open. . . . [H]er bedroom window was open and missing in its screen." *Hernandez*, 47 Cal. 3d at 328–29. Ryan had told her stepmother she was going out to play pool, but her pool cue and jacket were on the living room floor. *Id.* at 329. "[Her] purse was outside on the ground

intent to later "make a 'sandwich'" out of Ryan and "fuck her in the butt until she screams" strongly suggest that he planned ahead of time to sexually assault and rape her. That same evening, Ryan ended up in his van, and although Hernandez again tried to minimize his conduct by claiming that she "submitted freely," the evidence suggests that she was forced. Before the group of friends dispersed from the bar, Ryan's friend overheard Hernandez ask Ryan to meet up with him after the gathering, and Ryan responding "no." Hernandez admitted to the police that Ryan was "hesitant" about having sex with him but when he got "mad," she finally "said oh, okay" because he had pushed her arms down and was about to force himself upon her. Despite Hernandez's self-serving statements minimizing the amount of force used, his intent to rape Ryan is clear.

Hernandez's confession, coupled with the physical evidence, also revealed his intent to murder Ryan. After she was raped and forcibly sodomized, Ryan, like Bristol, was screaming, kicking, and resisting. Hernandez described his response as follows:

> I grabbed her, [held] onto her, and—uh—then she gargled—she like sputtered up—you know—I guess I was choking her too hard, and then I let go, and then she was—I told her to mellow out and to start putting her clothes on, and I turned around to start doing it again, and then she started screaming again and everything, and I just—I don't know—I grabbed her, and I just—I tried to shut her up

and items from the purse were spilled out." *Id.* The jury could have believed that Hernandez kidnapped Ryan, which would support a finding of specific intent to rape.

> and . . . [g]rabbed her around the throat . . .
> [w]ith one of my hands, and put one of my
> hands over her mouth to keep her quiet.

Hernandez strangled Ryan to death, and later admitted that he was thinking, in the same moment, of how he had killed Bristol in the same way just days before. His self-serving statement that he was "just . . . try[ing] to shut her up" is undermined by the fact that Ryan had significant bruising around her *neck*—showing his intent to kill her, not simply quiet her screams. *See People v. Frank*, 38 Cal 3d. 711, 733 (1985) (stating that "strangulation . . . [as] a manner of killing shows at least deliberate intent to kill" and can "support an inference of premeditation and deliberation"). Significantly, not only was he fully aware of his actions, Hernandez also had the presence of mind to contemplate the consequences. After he killed Ryan, he cut her torso with a piece of glass in a deliberate attempt to make her body look different than Bristol's. Hernandez's chilling insight into his own motivations gave the jury powerful, direct evidence of his willfulness, deliberation, and premeditation.

Finally, the level of detail in Hernandez's confession provided further compelling proof that he was aware of and intended his actions. In a largely chronological fashion, Hernandez took the police through the events leading up to the rapes and murders, including very specific descriptions of his actions. Apart from detailing his thoughts and motivations, *see supra*, Hernandez admitted to mutilating both of his victims' bodies post-mortem, and described the nature of the markings in detail. Hernandez said that he burned Bristol's pubic hair, explaining that he acted out of anger because Bristol had kicked him and damaged his van. He specifically remembered burning her left breast with a match, distinguishing that burn from the burns to her right

breast caused by pushing her up against the hot car during forcible sodomy. He also described burning Ryan's pubic hair with a lighter and putting out the flame with his hand, and cutting Ryan's nipple with a piece of broken glass. Significantly, Hernandez admitted all of this to the police before seeing any pictures of Bristol or Ryan's bodies. His detailed recollection belies any suggestion that he was somehow in a dissociative state when he raped and killed Bristol and Ryan and deliberately mutilated their bodies.

The majority dismisses the relevance of Hernandez's confession because a single expert, Dr. Clausen, opined that Hernandez's "ostensible recollection of details" was not inconsistent with a diminished capacity defense. Opinion at 25. Dr. Clausen based her rejection of Hernandez's detailed recollection on the speculation, without any support in the record, that because Hernandez spent five hours with the police before the recording of his confession, they must have fed him details of the crime. But the district court found that Hernandez's confession was voluntary, accurate, and reliable, and Hernandez does not challenge those findings here. *Hernandez v. Martel*, 824 F. Supp. 2d 1025, 1155–59 (C.D. Cal. 2011). Moreover, Dr. Clausen's explanation entirely fails to account for the many personal reflections that Hernandez freely shared about his feelings during the commission of the two crimes, like how he "thought about" Bristol's offer to "do anything" after he hit her. It is hard to imagine how a police officer could have fed Hernandez such specific information about his motivations and the source of his anger, which Hernandez clearly articulated.

In sum, the jury heard overwhelming evidence that Hernandez had the specific intent to rape both Bristol and Ryan, and that he murdered both women willfully, deliberately, and with premeditation.

## B. The Relatively Weak Diminished Capacity Evidence Would Not Have Resulted in a Reasonable Probability of a Different Outcome

The strength of the evidence of Hernandez's intent to rape and kill contrasts sharply with the relatively weak evidence "that might have been presented had counsel acted differently"—specifically, evidence that his mental condition rendered him incapable of forming the requisite intent. *See Clark*, 769 F.3d at 728 (quoting *Murtishaw*, 255 F.3d at 940). To reverse the murder convictions, the majority significantly overstates the habeas experts' findings.

At his post-conviction hearing, Hernandez presented testimony from five experts: psychologist June Madsen Clausen, psychiatrist Dorothy Otnow Lewis, criminologist Sheila Balkan, clinical psychologist Charles Sanislow, and neuropsychologist Ruben Gur. *Hernandez*, 824 F. Supp. 2d at 1043. Drs. Sanislow and Gur were used to rebut the findings of the state's expert, clinical psychologist Daniel Martell.[3] *Id.* at 1062.

Dr. Sanislow merely reviewed and commented on Martell's discredited evaluation of Hernandez. He found that the absence of bipolar indications in Martell's then-recent testing of Hernandez "[was] not a sufficient basis on which to conclude that Mr. Hernandez is *not* bipolar," and that a negative finding on the administered psychometric test "*does not rule out* the presence or past presence of psychopathology (e.g., dissociative disorders, bipolar or

---

[3] Like the majority, I give no independent consideration to Martell's findings because the district court found significant problems with his methodology and credibility. *See Hernandez*, 824 F. Supp. 2d at 1056.

other affective disorders)." (Emphases added.) While his conclusions were sufficient, among other reasons, to lead the district court to discount Martell's evaluation, they are certainly not a conclusive diagnosis of bipolar disorder.

Dr. Gur, the second rebuttal expert, believed Hernandez suffers from brain dysfunction. He found "clear indicat[ions] that [] Hernandez has deficits in understanding and interpreting facial expressions of affect, which would provide" the basis "for such confusion and misperceptions to have occurred during the commission of the crimes . . . interfer[ing] with his ability to comprehend and formulate an appropriate response to the victims' expressions of resistance and fear," and "significantly interfer[ing] with his ability to make the right judgment." But a lack of good judgment is not equivalent to the inability to form specific intent. Moreover, Hernandez's own statements—even made to Dr. Gur himself during their evaluation[4]—belie the notion that Hernandez could not perceive the emotions of his victims. On the contrary, Hernandez was able to articulate that his victims were afraid, did not consent to sexual activity, and resisted him. And while, in deposition, Dr. Gur concluded that "either schizophrenia or bipolar illness *is probably applicable* in his case," he also admitted that Hernandez could suffer from something else entirely, "such as attention deficit, hyperactivity disorder, impulse controls." *Hernandez*, 824 F. Supp. 2d at 1063 (emphasis added) (quoting Dr. Gur's deposition).

---

[4] Hernandez told Dr. Gur that Bristol "did not consent to anal intercourse." Dr. Gur does not explain how he concludes that Hernandez could have the mental capacity to commit forcible sodomy in that instant, but lack the capacity to form specific intent immediately before (while raping) or after (while strangling).

Dr. Lewis diagnosed Hernandez with psychosis and bipolar disorder, found that he had "compromised mental functioning," and concluded that his "capacity to form the specific intent to rape and kill[] was substantially impaired" at the time he committed the crimes. Dr. Balkan, a criminologist, provided a social history of Hernandez's life and otherwise largely quoted Dr. Lewis's conclusions. While these evaluations raise concerns about Hernandez's mental stability, they do not show that Hernandez lacked the ability to form the necessary specific intent for these crimes. Dr. Lewis found Hernandez's mental state to be "compromised" and "substantially impaired," but not necessarily inconsistent with specific intent to murder and rape. And, as she acknowledged, no single factor in Hernandez's difficult life accounts for his violent crimes.

The final habeas expert was Dr. Clausen, whose opinion comes closest to stating definitively that Hernandez could not have had the necessary specific intent. Dr. Clausen opined that Hernandez "was in a trauma-induced dissociative state" at the time of his crimes, "and as a result, has no subsequent actual recollection of the events that transpired." But the suggestion by Dr. Clausen that Hernandez was in a dissociative state and "had no subsequent actual recollection" of his crimes is totally contradicted by his detailed confession, the voluntariness and reliability of which Hernandez does not dispute.

Even generously construed, these opinions are grossly inadequate to undermine the evidence that Hernandez was capable of forming, and in fact formed, the intent to rape and kill Bristol and Ryan. First, the experts fail to account for the striking similarities between the two crimes. Dr. Gur theorized that mental impairments like Hernandez's could cause someone to "engage in a complex set of behaviors

without intent or premeditation," leading to "highly organized if somewhat ritualistic behavior." Opinion at 26. The majority relies on this to argue that the "sheer bizarreness of the nearly identical crimes" would have "supported, rather than undermine" a mental illness diminished capacity defense, Opinion at 26, but that inference is implausible. Hernandez's behavior does not suggest ritual so much as it expresses an intent to murder Bristol and Ryan because, as Hernandez himself explained, he was angry at their resistance.[5] And none of the other experts even attempted to explain how Hernandez could have committed two such similar crimes within a five-day period without intending to do so.

Second, the experts' reports also fail to counter the overwhelming evidence that Hernandez intended to rape Bristol and Ryan. The habeas experts uncovered no evidence to suggest Hernandez was in a dissociative state when he "thought about" Bristol's offer to "do anything" to save herself from his violence; when, earlier in the evening, he sexually harassed Ryan and bragged of plans to "get some" later; or when he pushed Ryan's arms down and raped her after she said no to sexual intercourse. In fact, even Dr. Clausen, who speculated that the police fed Hernandez the details of his confession and that Hernandez in fact did not remember much of the crimes due to dissociation, stated that Hernandez had "personal memory up to and including

---

[5] The majority also points to the similarities between the child abuse suffered by Hernandez and the way he harmed his victims. Opinion at 20–21, 26–27. As Dr. Lewis noted, "[c]hildren who have had objects shoved into their rectums repeatedly against their will are at a high risk of perpetrating similar acts on others." But Dr. Lewis does not claim this heightened risk might create a lack of capacity to form specific intent or that the abuse victim would only inflict similar violence while in a dissociative state.

having sex with Edna Bristol in the back of his van." Dr. Gur's dissociation theory was similarly temporally limited, noting that Hernandez's "clinical profile is further indication that he was in a dissociative state during his commission of the crimes*, or at least during some portion of that epoch, e.g., when he killed or inflicted post-mortem injuries*." (Emphasis added.) Thus, even assuming Hernandez dissociated during the murders, the experts' conclusions actually support the inference that Hernandez was at least aware of, and intended, his actions during the rapes. The intent to rape alone is enough to support the murder convictions.

Finally, the experts' dissociation theory fails to account for Hernandez's detailed explanation of his actions, thoughts, and motivations during the crimes. Drs. Gur and Lewis surmised that Hernandez's confession suggested that he was in "an altered mental state" on the nights of the crimes based on his statement that he "wasn't even feeling that [he] did it," and his request for psychiatric help because he "[didn't] know what would make [him] do this." The majority finds this "evidence of psychosis" would have been a convincing counterweight to his detailed confession. Opinion at 25–26. But "a reasonable jury could have easily chosen to disbelieve [these] self-serving" statements in light of Hernandez's extensive account of his innermost thoughts and motivations on the nights of the crimes. *See United States v. Nicholson*, 677 F.2d 706, 709 (9th Cir. 1982). Moreover, while Drs. Gur and Lewis make much of the fact that Hernandez is persistently "unable" to explain why he committed the brutal murders, this assertion is squarely contradicted by the record. Hernandez provided a plausible, albeit deeply disturbing explanation of his motives—he was angry at Bristol for talking too much, kicking him, and kicking a hole in his van, and he was angry at Ryan for

screaming and trying to escape. His explanation of how he expressed that anger (rape, forced sodomy, and strangulation) suggests intentional, premeditated actions and not dissociation or a lack of control that would negate the mens rea required for a first degree murder conviction. As the California Supreme Court correctly explained, "clearly the killings occurred when the victims screamed and struggled to get away. They occurred as a direct product of the sexual assaults and to silence the victims." *Hernandez*, 47 Cal. 3d at 348.

Given the weakness of the omitted experts' evaluations when compared to the overwhelming evidence actually presented to the jury, there is no reasonable possibility of a different outcome in this case. *See Strickland,* 466 U.S. at 694.

## C. The Majority's Remaining Arguments Are Unconvincing

The majority notes that we have "repeatedly" found prejudice where "there was some evidence of the defendant's mental impairments in the record" that counsel failed to investigate, Opinion at 23, but every cited case contains far more compelling evidence of prejudice than we have here. All the cases relied on by the majority involve defendants with conclusive diagnoses of significant psychosis and mental health problems. In *Daniels v. Woodford*, the petitioner had been diagnosed with schizophrenia and a paranoid disorder that he experienced "at significant times prior to the shootings as well as during the shooting" of which he was convicted. 428 F.3d 1181, 1204 (9th Cir. 2005). In *Jennings v. Woodford*, the petitioner was a diagnosed schizophrenic and "a long-term methamphetamine addict who had used the drug on the night" of his crime; had a history of suicide attempts;

repeatedly "injur[ed] himself intentionally and pour[ed] liquids in the resulting wounds," and had been involuntarily committed for psychiatric reasons. 290 F.3d 1006, 1015 (9th Cir. 2002). In *Bloom v. Calderon*, the petitioner had previously been referred for psychiatric treatment, had experienced auditory and visual hallucinations, and post-conviction experts found "*striking, consistent and clear* evidence of cognitive sensori-motor [sic] deficits, brain dysfunction and brain damage." 132 F.3d 1267, 1274, 1276 (9th Cir. 1997). In comparison, Hernandez's experts reached far less definitive conclusions regarding the extent of Hernandez's neurological damage and mental illness and how his conditions might have affected his ability to form the requisite intent.

Moreover, in *Daniels*, our prejudice finding was driven by the relevance of fully-developed diminished capacity evidence to possible imperfect self-defense. We noted that the petitioner's paranoia and schizophrenia could have led him to believe the police officers he shot "were coming to kill or seriously harm him." 428 F.3d at 1208. Indeed, they had actually done so before. *Id.* at 1209 (noting "that Daniels had previously been shot by the police nine times"). *See also Seidel v. Merkle*, 146 F.3d 750, 756–57 (9th Cir. 1998) (finding prejudice where counsel failed to investigate his client's mental health for a possible imperfect self-defense theory where petitioner had been convicted of knifing someone during a struggle). That context is entirely absent here.

Finally, while diminished capacity, when available, could serve as a defense even to crimes that involved significant premeditation, *see Daniels*, 428 F.3d at 1207–08, no reasonable juror would have discounted Hernandez's disturbing but plausible explanation of his state of mind as

he raped and murdered Bristol and Ryan.  The mental health
and neurological evidence presented on collateral review
cannot explain away this awareness such that a rational juror
would have found Hernandez to lack the required specific
intent to rape and kill Bristol and Ryan.

*    *    *

I respectfully dissent from Part II of the majority opinion
and would deny the habeas petition.